# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ESTATE OF YAEL BOTVIN,      :
by and through its Administrator    :
Russell Ellis, *et al*.,         :
                                 :
          Plaintiffs,      :    Civil Action No.:    05-0220 (RMU)
                                 :
          v.               :    Re Document No.:    26
                                 :
ISLAMIC REPUBLIC OF IRAN   :
*et al.*,                        :
                                 :
          Defendants.     :

## MEMORANDUM OPINION

**DENYING THE PLAINTIFFS' MOTION FOR RELIEF UPON RECONSIDERATION OF AN INTERLOCUTORY ORDER; DENYING WITHOUT PREJUDICE THE PLAINTIFFS' SUPPLEMENTAL MOTION FOR DEFAULT JUDGMENT**

## I. INTRODUCTION

This matter is before the court on the plaintiffs' motion for relief upon reconsideration of an interlocutory order and the plaintiffs' supplemental motion for default judgment.[1] The plaintiffs have brought suit against the Islamic Republic of Iran, the Iranian Ministry of Information and Security and the Iranian Revolutionary Guard under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*. Through this action, the plaintiffs seek to hold the defendants responsible for a 1997 terrorist attack perpetrated by Hamas operatives in Jerusalem, Israel. In February 2010, the court ruled that District of Columbia choice of law rules dictated the application of Israeli law to the plaintiffs' substantive causes of action. Noting that

---

[1] In the plaintiffs' submission, which they title "supplemental motion for entry of default judgment," the plaintiffs argue that the court erred in a previous interlocutory ruling and that the court should enter default judgment in their favor. *See infra* Part III. Accordingly, the court construes the plaintiffs' submission as constituting two distinct motions: one for relief upon reconsideration of an interlocutory ruling and one for default judgment.

the plaintiffs had not established the defendants' liability under Israeli law, the court denied the motion for default judgment without prejudice.

In their most recent submission, the plaintiffs ask the court to revisit its previous choice of law ruling and conclude that California law, rather than Israeli law, governs this case. Furthermore, the plaintiffs assert that even if Israeli law governs both liability and damages, the plaintiffs are entitled, under Israeli law, to a default judgment.

Because the plaintiffs have failed to demonstrate that the court erred in its earlier choice of law ruling, the court denies the plaintiffs' motion for relief upon reconsideration and concludes that Israeli law governs this case. Furthermore, because the plaintiffs have not established to the court's satisfaction that the defendants are liable under Israeli law for the tortious conduct alleged in the complaint, the court denies the plaintiffs' renewed motion for default judgment without prejudice.

## II.  FACTUAL & PROCEDURAL BACKGROUND

The plaintiffs' claims stem from an Iranian-sponsored triple-suicide bombing at an Israeli pedestrian mall on September 4, 1997.[2]  Compl. ¶ 18.  The attack, conducted by Hamas operatives, resulted in the death of fourteen-year-old Yael Botvin, daughter of plaintiff Julie Goldberg-Botvin and sister to plaintiffs Tamar and Michal Botvin.  Mem. Order (Sept. 24, 2007) at 1.

In October 2006, the plaintiffs filed a motion in which they requested that the court enter a default judgment against the defendants, after taking judicial notice of the findings of fact and conclusions of law in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C.

---

[2]     More detailed summaries of the relevant facts and procedural history may be found in prior decisions of this court. *See* Mem. Op. (Feb. 16, 2010) at 2-3; Mem. Order (Mar. 24, 2009) at 1-2; Mem. Order (Sept. 24, 2007) at 1-2.

2003), a case arising out of the same terrorist attack at issue here.  *See* Pls.' Mot. to Take Judicial

Notice ¶¶ 8-10.  The court granted the plaintiffs' request for judicial notice, but declined to enter

a default judgment, as the plaintiffs had failed to establish other vital elements of their claims.

*See* Mem. Order (Sept. 24, 2007) at 2-3.

 The court denied the plaintiffs' subsequent motion for default judgment, filed in March

2008 on similar grounds.  *See generally* Mem. Order (Mar. 27, 2009).  In response to the

plaintiffs' third motion for default judgment, filed in May 2009, the court concluded that the

plaintiffs had established the court's subject matter jurisdiction over the dispute and personal

jurisdiction over the defendants pursuant to the FSIA.  *See* Mem. Op. (Feb. 16, 2010) at 4-7.  The

court also concluded that under the District of Columbia's choice of law rules, the plaintiffs'

substantive claims were governed by Israeli law.  *Id.* at 7-11.  Because the plaintiffs had not

established the defendants' liability under Israeli law, having addressed their claims to California

law instead, the court denied without prejudice the plaintiffs' motion.  *Id.* at 11-12.

 The plaintiffs now move for relief upon reconsideration of the court's choice of law

ruling, arguing that either California or District of Columbia law should govern both liability and

damages, or at the very least, the issue of damages.  Pls.' Mot. at 4.  Alternatively, the plaintiffs

contend that even if Israeli law governs both liability and damages, they are nonetheless entitled

to a default judgment and substantial damages under Israeli law.  *See id.* at 10.  The court now

turns to the plaintiffs' arguments and the relevant legal standards.

### III.  ANALYSIS

**A.  The Court Denies the Plaintiffs' Motion for Relief upon Reconsideration of an Interlocutory Order**

**1.  Legal Standard for Relief Upon Reconsideration of an Interlocutory Order**

A district court may revise its own interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."  FED. R. CIV. P. 54(b); *see also Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000) (citing the Advisory Committee Notes to Federal Rule of Civil Procedure 60(b)).  The standard for the court's review of an interlocutory decision differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b).  *Compare Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 42, 48 n.6 (D.D.C. 2001) (noting that "motions for [relief upon] reconsideration of interlocutory orders, in contrast to motions for [relief upon] reconsideration of final orders, are within the sound discretion of the trial court") *and United Mine Workers v. Pittston Co.*, 793 F. Supp. 339, 345 (D.D.C. 1992) (discussing the standard applicable to motions to grant relief upon reconsideration of an interlocutory order) *with LaRouche v. Dep't of Treasury*, 112 F. Supp. 2d 48, 51-52 (D.D.C. 2000) (analyzing the defendant's motion for relief from judgment under Rule 60(b)) *and Harvey v. Dist. of Columbia*, 949 F. Supp. 878, 879 (D.D.C. 1996) (ruling on the plaintiff's motion to alter or amend judgment pursuant to Rule 59(e)).  A motion pursuant to Rule 59(e), to alter or amend a judgment after its entry, is not routinely granted.  *Harvey*, 949 F. Supp. at 879.  The primary reasons for altering or amending a judgment pursuant to Rule 59(e) or Rule 60(b) are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.  *Id.*; *Firestone v. Firestone*, 76 F.3d

1205, 1208 (D.C. Cir. 1996) (per curiam); FED. R. CIV. P. 60(b); *LaRouche*, 112 F. Supp. 2d at 51-52.

By contrast, relief upon reconsideration of an interlocutory decision pursuant to Rule 54(b) is available "as justice requires." *Childers*, 197 F.R.D. at 190. "As justice requires" indicates concrete considerations of whether the court "has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citation omitted). These considerations leave a great deal of room for the court's discretion and, accordingly, the "as justice requires" standard amounts to determining "whether [relief upon] reconsideration is necessary under the relevant circumstances." *Id.* Interlocutory orders "may always be reconsidered prior to final judgment" and are not "subject to the law of the case doctrine." *Filebark v. U.S. Dept. of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (quoting *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997)).

A ruling is subject to the more lenient "interlocutory" standard of reconsideration if no appeal will lie, as the order or decision "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." *See* FED. R. CIV. P. 54 (a)-(b). Orders denying default judgment under Fed. R. Civ. P. 55(b)(2) are not considered "appealable final order[s]," and are thus interlocutory. *Adult Film Ass'n of Am., Inc. v. Thetford*, 776 F.2d 113, 115 (5th Cir. 1985). Therefore, this court is free to reconsider its previous order denying default judgment.

**2.  The Court Properly Determined That Israeli Law Governs the Plaintiffs' Claims Under District of Columbia Choice of Law Provisions**

As the court noted in its February 2010 ruling, the FSIA provisions under which the plaintiffs bring suit do not provide a federal cause of action against foreign states.[3]  Mem. Op. (Feb. 16, 2010) at 7; *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009).  Thus, the plaintiffs are "required to identify, and to bring claims pursuant to, some other 'cause of action arising out of a specific source of law.'"  *Oveissi*, 573 F.3d at 840 (quoting *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004)).  Claims brought under state statutory and common law, as well as foreign law, may satisfy this requirement.  *See id.* at 840, 844.  To determine which body of law governs the plaintiffs' claims, the court applies the District of Columbia's choice of law rules.  *See id.* at 842.

The court's prior choice of law analysis relied extensively on *Oveissi*, which contains this Circuit's most recent application of District of Columbia choice of law provisions to tort claims arising from an extra-territorial terrorist attack.  *See* Mem. Op. (Feb. 16, 2010) at 8-11.  In *Oveissi*, the Circuit determined that under District of Columbia choice of law rules, French law governed tort claims brought by an American citizen whose grandfather had been assassinated in a terrorist attack.  *Oveissi*, 573 F.3d at 842.  In reaching its conclusions, the Circuit noted that the alleged tortious conduct occurred in France, the victim was an Iranian national domiciled in France, the plaintiff was also a French domiciliary at the time of the attack and the assassination was not intended to affect the United States or national interests.  *See id.* at 842-44.

Relying on *Oveissi*, this court determined that Israeli law governs the plaintiffs' claims, as the plaintiffs and the victim were domiciled in Israel, where the bombing occurred.  *See* Mem.

---

[3]       The plaintiffs bring suit under 28 U.S.C. § 1605(a)(7) (2006), rather than the more recent § 1605A.  *See* Mem. Op. (Feb. 16, 2010) at 3 n.2.  Section 1605A, unlike its predecessor, establishes a substantive federal cause of action against foreign states.  *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 844 (D.C. Cir. 2009).

Op. (Feb. 16, 2010) at 10.  The court noted that unlike the victim in *Oveissi*, the decedent in this case was an American citizen, but concluded that the distinction was not dispositive, given the lack of evidence that the terrorist attack "was targeted specifically at U.S. nationals or was otherwise intended to affect the United States."  *Id.*

In their motion for relief upon reconsideration, the plaintiffs argue that the court wrongly concluded that Israeli law governs the plaintiffs' claims.  *See* Pls.' Mot. at 5-11.  First, the plaintiffs assert that the court erred in relying so extensively on the Circuit's reasoning in *Oveissi* because the Circuit "did *not* mandate strict adherence" to the choice of law analysis articulated in that decision.  *Id.* at 9.  To support this contention, the plaintiffs rely on a passage in *Oveissi* in which the Circuit states that it is "not setting forth a general choice-of-law rule for terrorism cases, but merely applying the District of Columbia's rules to the facts of a case filed under former § 1605(a)(7)."  *See id.* (quoting *Oveissi*, 573 F.3d at 844).

The plaintiffs, however, misconstrue the Circuit's admonition, which merely cautioned that the ruling in *Oveissi* resulted from the application of established District of Columbia choice

of law principles,[4] and was not intended to create a special body of law governing all terrorism cases. *See Oveissi*, 573 F.3d at 844 (distinguishing terrorism cases filed under the more recent § 1605A, which creates a federal cause of action, rendering state choice of law analysis irrelevant). Therefore, the Circuit's statement that it was "not setting forth a general choice-of-law rule for terrorism cases" has no impact on this court's earlier analysis, as this case, like *Oveissi*, involves claims brought under § 1605(a)(7) and is governed by District of Columbia choice of law provisions. *See id.*; *see also* Pls.' Mot. at 5-8.

The plaintiffs also contend that the court erred in directing the application of Israeli law to their claims because *Oveissi* recognizes a unique national interest in applying domestic law to terrorist attacks on U.S. nationals. Pls.' Mot. at 9. The plaintiffs argue that the result in *Oveissi*, in which the victim was a French national, should not dictate the outcome of this case, in which the victim was a U.S. citizen. *See id.* at 9-10.

---

[4]    The District of Columbia's choice of law framework calls on the court to conduct a threshold inquiry to ensure that a "true conflict" exists between the laws of interested jurisdictions. *See Gov't Emp. Ins. Co. v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (citing *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985)). Should a "true conflict" exist, the court must then determine which jurisdiction has the most compelling interest in having its laws applied, utilizing the "government interests analysis" and the "most significant relationship" tests. *See Oveissi*, 573 F.3d at 842-43 (citing *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 & 41 n.18 (D.C. 1989)). In *Oveissi*, however, the Circuit bypassed the threshold "true conflict" inquiry, focusing its analysis solely upon which jurisdiction had the most compelling interest. *See Oveissi*, 573 F.3d at 842. This court followed suit in its earlier choice of law ruling, declining to address the threshold inquiry of whether a "true conflict" existed among the various jurisdictions. *See* Mem. Op. (Feb. 16, 2010) at 7-11. In their motion for relief upon reconsideration, the plaintiffs do not challenge the court's omission of the threshold inquiry. *See generally* Pls.' Mot. At any rate, it is far from clear that California or the District of Columbia constitute "interested" jurisdictions for the purposes of the analysis, given that the plaintiffs and victim only briefly resided in California and were domiciled in Israel, the injuries and tortious conduct alleged did not occur in California and the District of Columbia's sole interest is that of the forum state. *See Gov't Emp. Ins. Co.*, 958 F.2d at 1141 (citing *Eli Lilly*, 764 F.2d at 882) (requiring multiple "interested" jurisdictions to trigger "true conflict" inquiry); *see also Oveissi*, 573 F.3d at 842-43 (refusing to conduct rigorous choice of law analysis based on the "slight" interest of a state in which the plaintiff was born and briefly resided). Accordingly, the court declines to revisit this aspect of its earlier ruling.

As acknowledged in *Oveissi* and this court's earlier ruling, the United States has a "strong interest in applying its domestic law to terrorist attacks on its nationals." *Ovessi*, 573 F.3d at 843 (quoting *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *20 n.16 (D.D.C. Mar. 29, 2005)); Mem. Op. (Feb. 16, 2010) at 10.  As discussed in this court's earlier ruling, however, this "strong interest" does not amount to a categorical rule that domestic law applies whenever a U.S. citizen is injured abroad, regardless of the circumstances of the incident or the extent of the victim's connections to the domestic jurisdiction.[5]  Mem. Op. (Feb. 16, 2010).  To the contrary, *Oveissi* indicates that the interest of the United States in applying domestic law to an extra-territorial terrorist attack is far more compelling when the attacks have been directed at U.S. citizens "by reason of their nationality" or were directed against state interests.  *Oveissi*, 573 F.3d at 843 (quoting *Dammarell*, 2005 WL 756090, at *20 & n.16).  Thus, in its prior ruling the court declined to give dispositive weight to the victim's nationality, as the plaintiffs and victim were domiciled in Israel at the time of the attacks, the attacks occurred in Israel, California's interest arose solely from the fact that the plaintiff was born and briefly resided there and the plaintiffs had produced "no evidence that the terrorist attack was targeted specifically at U.S. nationals or was otherwise intended to affect the United States."  Mem. Op. (Feb. 16, 2010) at 10.

---

[5]     Indeed, prior decisions that have applied domestic law, rather than foreign law, to claims arising from state-sponsored terrorist attacks have generally considered the "unique interest" of the United States determinative when the plaintiff is domiciled in a domestic jurisdiction, citing the "paramount" interest of domiciliary states in providing relief to their residents.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 133 (D.D.C. 2005) (applying the laws of the state in which each plaintiff was domiciled, based on the dual interests above); *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *19-21 (D.D.C. Mar. 29, 2005) (applying the law of the state of domicile, after recognizing that the unique interest of the United States in applying domestic law to actions involving state-sponsored terrorist attacks abroad heightened the "often paramount" interest of the jurisdiction of domicile in "guaranteeing redress to its citizens").  By contrast, the victim and plaintiffs in the current case were and are domiciled in Israel.  *See, e.g.*, Pls.' Mot., Ex. 9 (Aff. of Michal Botvin) ¶¶ 4, 12; Pls.' Mot., Ex. 11 (Aff. of Tamar Botvin) ¶¶ 5-6; Pls.' Renewed Mot. for Default J. at 8.

In their most recent submission, the plaintiffs have provided no persuasive evidence that the suicide bombings in question were directed at state interests or specifically targeted American citizens based on their citizenship.  *See* Pls.' Mot. at 9-10.  Although the plaintiffs suggest that the U.S. government has concluded that the attack in question was designed to disrupt the Israeli-Palestinian peace process, *see id.*, that assertion is based on a single, unsubstantiated statement on a website, which broadly references multiple attacks and does not offer support for its conclusion.  *See id.* (citing *Violence in Opposition to the Middle East Peace Negotiations – 1993 to Present*, REWARDS FOR JUSTICE, http://www.rewardsforjustice.net/index.cfm?page=MEP_Victims&language=english ("Rewards for Justice Website")).[6]  Moreover, even if the attack was intended "to disrupt peace negotiations and to modify the attitudes of the leaders engaged in them," the website does not suggest that the attack was intended to influence the attitudes of American officials, *see* Rewards for Justice Website, who served only as facilitators to the negotiations rather than direct participants, *see* Pls.' Mot. at 9-10.  In short, the plaintiffs have presented no evidence that the bombing of a pedestrian market in Jerusalem designed to disrupt Israeli peace negotiations was directed at U.S. citizens or targeted U.S. state interests.  *See Oveissi*, 573 F.3d at 843 (finding that "if any country was the object of the attack, it was France"); *cf. Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 123-24 (D.D.C. 2005) (noting the unique U.S. interest in the abduction and torture of two U.S. citizens, alleged to be covert operatives for the Central Intelligence Agency, an act intended in part to provide Libyan officials with the identities of other operatives); *Dammarell*, 2005 WL 756090, at *1 (concluding that U.S. interests predominated in a case arising out of a direct assault on the U.S. embassy in Beirut).

---

[6]    The "Rewards for Justice" website appears to be a website operated by the U.S. Department of State that offers rewards for information about international terrorism. http://www.rewardsforjustice.net  (last visited Mar. 18, 2011).

Although the United States, like the rest of the world, has a compelling interest in facilitating the Middle East peace process, the court cannot simply presume that any violence resulting in harm to a U.S. citizen in that region equates to an attack on state security or interests. In the absence of evidence to the contrary, the court cannot conclude that these unfortunate events were directed against Yael Botvin by reason of her nationality or that the "unique interest" of the United States outweighs the interest of Israel with respect to the terrorist attack at issue merely because the victim was a U.S. citizen. The court therefore finds no reason to amend its prior choice of law analysis, and concludes that Israeli law most appropriately governs the plaintiffs' claims.

### 3. Damages Are Most Appropriately Determined by Israeli Law

Alternatively, the plaintiffs argue that even if Israeli law governs the issue of liability, California or District of Columbia law should govern the issue of damages. Pls.' Mot. at 11. Much like they did in arguing that domestic law should govern the entire case, the plaintiffs assert that the United States has a strong interest in applying domestic damages law to suits involving terrorist attacks against U.S. nationals. *Id.*

District of Columbia choice of law rules permit courts to apply the laws of different jurisdiction to different causes of actions and issues within a single case. *Hercules*, 566 A.2d at 41-43 (quoting Restatement (Second) of Conflict of Laws § 145 cmt. d (1971 & Supp. 1988)); *see also Keene Corp. v. Ins. Co. of N. Am.*, 597 F. Supp. 934, 938 (D.D.C. 1984) (citing *James v. Powell*, 225 N.E.2d 741, 746-47 (N.Y. 1967)) (noting that District of Columbia choice of law principles may be applied separately to the issues involving damages, as "[s]tates' interests in compensatory damages differ from those involved in punitive damages"). The court must evaluate the interest of each jurisdiction with respect to the distinct issues to be adjudicated.

*Hercules*, 566 A.2d at 41 (quoting *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 (D.C. 1985)); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) cmt. d (1971) ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more potentially interested states.").

In this case, the plaintiffs have failed to explain why the interest of the United States in applying domestic law to the issue of damages outweighs Israel's interest in the matter, given that the attack occurred in Israel, the victim was domiciled in Israel and the plaintiffs reside in Israel. *See supra* Part III.A.2. Indeed, the sole authority the plaintiffs rely on to support this argument, *Dammarell*, concluded that the U.S. interest in applying domestic law to a case involving an extra-territorial attack on American victims predominated, not because the victims were U.S. nationals, but because the attack was carried out against an American embassy and diplomatic personnel and, as a result, implicated state interests. 2005 WL 756090, at \*20 & n.16. As already discussed, the plaintiffs have produced no satisfactory evidence that the suicide bombing at issue was intended as an attack against state interests. *See supra* Part III.A.2. Thus, Israeli law most appropriately governs the limited issue of damages, as well as liability.

In sum, the court finds no reason to amend or alter its prior interlocutory ruling directing the application of Israeli law to issues of both liability and damages. The plaintiffs' motion for relief upon reconsideration is thus denied.

### B. The Court Denies Without Prejudice the Plaintiffs' Motion for Default Judgment

#### 1. Legal Standard for Default Judgment Against a Foreign State

A court shall not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003). This

"satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d).[7] *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  In evaluating the plaintiffs' proof, the court may "accept as true the plaintiff[s'] uncontroverted evidence," *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000), including proof by affidavit, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### 2.  Legal Standard for Establishing the Law of a Foreign Jurisdiction

Federal Rule of Civil Procedure 44.1 provides that when determining the law of a foreign jurisdiction the court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  FED. R. CIV. P. 44.1.  Most often, foreign law is established through "written or oral expert testimony accompanied by extracts from foreign legal material."  *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984).  Such expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case.  *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 182 (D.D.C. 2006).

The court, however, need not uncritically accept such expert testimony and may "engage in its own research . . . [or] reexamine and amplify material that has been presented by counsel in

---

[7]     Rule 55(d) states that "[a] default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court."  FED. R. CIV. P. 55(d).

partisan fashion."[8] FED. R. CIV. P. 44.1 advisory committee's note.  Indeed, the court retains the authority to conduct an independent inquiry and to "reject even uncontradicted expert testimony."  *Rutgerswarke AG v. Abex Corp.*, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002) (citing *Curtis v. Beatrice Foods Co.*, 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980), *aff'd*, 633 F.2d 203 (2d Cir. 1980)); *accord Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 395 n.60 (S.D.N.Y. 2007) (quoting *Guidi v. Inter-Continental Hotels Corp.*, 2003 WL 1907901, at *2 (S.D.N.Y. Apr. 16, 2003)).

Nevertheless, should the parties fail to provide an "adequate statement of the law," the court is not obligated to independently remedy the deficiency.  *Minnebea*, 444 F. Supp. 2d at 185; *see also McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 n.10 (9th Cir. 1989) (citing *Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1193 (7th Cir. 1985)) (noting that "nothing requires the court to conduct its own research into obscure sources"); FED. R. CIV. P. 44.1 advisory committee's note (authorizing the court to conduct independent research, but explicitly allowing the court to "insist on a complete presentation by counsel").  In the absence of sufficient

---

[8]     Some Circuits have observed that although Rule 44.1 grants courts broad authority to conduct independent research, it does not impose a duty on them to do so.  *See Baker v. Booz Allen Hamilton, Inc.*, 2009 WL 5125672, at *3 (4th Cir. Dec. 28, 2009) (citing *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205 (1st. Cir. 1988)); *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d. Cir. 1999) (citing *Carey*, 864 F.2d at 205).  At least one Circuit, however, has suggested that courts should conduct a more active inquiry, particularly when relying on expert testimony to establish foreign law.  *See Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 629 (7th Cir. 2010) (stating a preference for independent investigation, as reliance on expert testimony still requires the court to discount the inevitable "adversary's spin"); *id.* at 632 (Posner, J., concurring) (stating that courts are rarely justified in relying on expert testimony to establish foreign law); *but see id.* at 638 (Wood, J., concurring) (stating that Rule 44.1 "establishes no hierarchy for sources of foreign law," as American jurists cannot be expected to appreciate the nuances of a foreign legal system).  The possibility of a court being led astray by partisan expert testimony is heightened in cases like this one, in which adversarial briefing is lacking.  *See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (noting that the veracity of expert testimony is generally tested through the adversarial process, including competing expert testimony and cross-examination).  Thus, the court concludes that it must at least conduct sufficient independent research to guard against erroneous or exaggerated claims by partisan experts.

information about the foreign law, "the forum will usually decide the case in accordance with its

own local law except when to do so would not meet the needs of the case or would not be in the

interests of justice.[9]  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 136 cmt. h (1971).

### 3. The Plaintiffs Have Not Established the Defendants' Liability Under Israeli Law to the Court's Satisfaction

The plaintiffs assert that because the defendants provided material support that allowed

Hamas to carry out the suicide bombing, they are, under Israeli law, vicariously liable for the

assault that resulted in the death of Yael Botvin.[10]  *See* Pls.' Mot. at 11-16.  The plaintiffs further

contend that as a result, the defendants may also be held liable for wrongful death and direct and

derivative mental injury.[11]  *See id.* at 11-20.  The sufficiency of the plaintiffs' evidence

concerning these claims is considered below.

### a.  Vicarious Liability for Assault

The plaintiffs first assert that under Israeli law, the defendants are vicariously liable for

the actions of the Hamas operatives who perpetrated the September 4, 1997 suicide bombing,

based on the findings of fact and conclusions of law made in *Campuzano*, which have been

---

[9]   In this case, the court has instructed the plaintiffs to apply Israeli law instead of the law of the forum.  *See* Mem. Op. (Feb. 16, 2010) at 10-11.  Thus, should the plaintiff fail to sufficiently establish the foreign law, it would not meet the needs of the case or be in the interests of justice to allow forum law to control.

[10]  The plaintiffs also assert a separate survival claim for battery under Israeli law.  *See* Pls.' Mot. at 14.  According to the plaintiffs' own experts, however, Israeli law does not recognize battery as a distinct cause of action.  *See* Pls.' Mot., Ex. 1 (Aff. of Ovadya Gabbay and Michael Deborin ("Pls.' Expert Aff.")) ¶¶ 8-9, 13 n.3.  Rather, Israeli has codified a single tort of assault, which may be proved by establishing one of two sets of elements, roughly corresponding to the American torts of battery and assault.  *See* Civil Wrongs Ordinance (New Version), 5728-1968, 2 LSI 5, §23 (1972) (Isr.); Pls.' Expert Aff. ¶ 13 n.3.  Thus, the plaintiffs cannot assert distinct claims for both battery and assault under Israeli law.

[11]  "Mental injury" is an Israeli tort similar to intentional infliction of emotional distress.  *See* Pls.' Expert Aff. ¶ 17.

adopted in this case.[12]  *See* Pls.' Mot. at 12.  According to the plaintiffs, these findings establish

that the defendants provided training and material support to Hamas, the organization

responsible for the bombing, rendering the defendants vicariously liable for the resulting injuries

under Israeli law.  *Id.*  In support of this assertion, the plaintiffs have submitted an expert

affidavit from two experienced practitioners of Israeli tort law.  *See generally* Pls.' Mot., Ex. 1

(Aff. of Ovadya Gabbay and Michael Deborin ("Pls.' Expert Aff.").

　　　The modern Israeli judicial system generally functions as a common law regime, though

it retains vestiges of its civil law origins.  *See* Yoram Shachar, *History and Sources of Israeli*

*Law*, *in* INTRODUCTION TO THE LAW OF ISRAEL 1, 6-9 (Amos Shapira & Keren C. DeWitt-Arar

eds., 1995); Pls.' Expert Aff. ¶ 7.  The primary source of Israeli tort law is the Civil Wrongs

Ordinance (New Version) ("CWO"), enacted in 1968, which codifies the rules governing

liability, defenses and damages.  Ariel Porat, *Tort Law*, *in* INTRODUCTION TO THE LAW OF ISRAEL

127, 127 (Amos Shapira & Keren C. DeWitt-Arar eds., 1995).

　　　Article 14 of the CWO embodies the principle of vicarious liability.  Pls.' Expert Aff. ¶

34-35.  It provides that "[a]ny person who employs an agent . . . to do any act or class of acts on

his behalf shall be liable for anything done by such agent in the performance of, and for the

manner in which such agent does such act or class of acts."  CWO (New Version), 5728-1968, 2

LSI 5, §14 (1972) (Isr.).  An agency relationship is recognized when a party acts as the surrogate,

---

[12]　　This court previously took notice of the "findings and conclusions" of *Campuzano*, a case in
　　which the court held that the Republic of Iran and the other defendants were liable  for the same
　　suicide bombing at issue here.  *See* Mem. Order (Sept. 24, 2007) at 2.  As the plaintiffs appear to
　　acknowledge, however, the court in *Campuzano* considered the defendants' liability primarily
　　under the rubric of § 1605(a)(7) and the Flatow Amendment, *see Campuzano*, 281 F. Supp. 2d at
　　269-70, which no longer embody a substantive cause of action, *see Cicippio-Puleo v. Islamic*
　　*Republic of Iran*, 353 F.3d 1024, 1032-33 (D.C. Cir. 2004) (noting that satisfying the
　　requirements of § 1605(a)(7) and the Flatow Amendment serves only to establish jurisdiction).
　　Although *Campuzano* addressed several common law claims brought by some of the plaintiffs, it
　　made no finding of vicarious liability independent of the statutory analysis, nor did it apply Israeli
　　law.  *See id.* at 270-71.  Thus, the legal conclusions made in *Campuzano* and adopted here do not
　　establish the vicarious liability of the defendants under Israeli law.

or "long arm," of the defendant.  Israel Gilead, *Tort Law*, *in* THE LAW OF ISRAEL: GENERAL SURVEYS 275, 437 (Itzhak Zamir & Sylviane Colombo eds., 1995); *see also* Pls.' Expert Aff. ¶¶ 33-36.

Despite the questionable relevance of the legal conclusions in *Campuzano*, the findings of fact made in that case and adopted here provide a sufficient basis to determine whether an agency relationship existed between the defendants and those who directly perpetrated the attack. *See Campuzano*, 281 F. Supp. 2d. at 261-62.  The *Campuzano* court noted that the bombing was carried out by Hamas operatives and that Hamas itself had claimed responsibility for the attack. *Id.*  The court also found that at the time of the bombing, Iran, through the Ministry of Information and Security, funneled millions of dollars to Hamas each year.  *Id.* at 261. Furthermore, the Iranian Revolutionary Guard, the military wing of the Ministry, provided "professional military and terrorist training" to Hamas operatives.  *Id.* at 262.  As a result, the U.S. Department of State identified Iran as a state sponsor of terrorism.  *Id.*  The court noted that the perpetrators of the September 4, 1997 attack had personally received terrorist training from the Revolutionary Guard, and concluded that the bombing would not have occurred without the material support provided by the defendants.  *Id.*

In sum, the defendants provided Hamas with crucial funding, support and training necessary to allow Hamas to conduct terrorist attacks, including the one that resulted in the death of Yael Botvin.  *See id.* at 261-62.  As a result, the suicide bombers operated as surrogates for the defendants when performing that particular "class of acts," – *i.e.*, the terrorist attacks, establishing an agency relationship between the Hamas operatives and the defendants under Israeli law.  *See* Gilead, *supra*, at 437 (noting that the court may consider which party supplied the tools and incurred the costs, as well as the degree of integration and control among the

parties).  The defendants, as principals, are liable under Israeli law for "anything done by [the]

agent in the performance of . . . [such] class of acts."[13]  *See* CWO (New Version), 5728-1968, 2

LSI 5, §14 (1972) (Isr.).

The CWO, however, also codifies several limitations on the vicarious liability doctrine

set forth in Article 14.  *See* Gilead, *supra*, at 363.  Article 25, in particular, provides that

"[n]otwithstanding anything contained in this Ordinance, no principal or employer will be liable

for any assault committed by his agent or employee unless he has *expressly* authorized or ratified

such assault."  CWO (New Version), 5728-1968, 2 LSI 5, §25 (1972) (Isr.).  This provision

appears to limit the liability of "principals" established under Article 14, but is not discussed in

the plaintiffs' most recent memorandum, nor is it addressed in the expert testimony submitted by

the plaintiffs.  *See generally* Pls.' Mot.; Pls.' Expert Aff.

Although the findings of fact in *Campuzano* plainly establish that Iran provided the

material support that made the suicide bombing possible, the court in *Campuzano* did not find

that the defendants expressly authorized or ratified the attack.  281 F. Supp. 2d at 261-62, 269-

79.  Nor have the plaintiffs here offered any additional evidence of Iran's ratification of the

attack, or any evidence that Iran's official state policy of supporting terrorist activities by Hamas

constitutes express authorization or ratification under Israeli law.  *See generally* Pls.' Mot.; Pls.'

Expert Aff.  Indeed, the plaintiffs have failed to provide the court with any information regarding

---

[13]     The factual findings in *Campuzano* also suggest that the defendants might be liable for the attack
under Article 12 of the CWO, which states that "any person who joins or aids in, authorises,
counsels, commands, procures, or ratifies any act done or to be done . . . by any other person,
shall be liable for such act or omission."  CWO (New Version), 5728-1968, 2 LSI 5, §12 (1972)
(Isr.).  Because the plaintiffs have not asserted the defendants' liability under Article 12, the court
will not address this potential theory of liability.  *See* Pls.' Mot. at 12 (arguing for vicarious
liability based solely on Article 14); *see generally* Pls.' Expert Aff. (making no mention of
Article 12).

what is required to satisfy the "express authorization or ratification" requirement.  *See generally* Pls.' Mot.; Pls.' Expert Aff.

As already noted, the court is not obligated to remedy deficiencies in the presentation of foreign law offered by the plaintiffs.  *See* FED. R. CIV. P. 44.1 advisory committee's note (declaring the court "free to insist on a complete presentation by counsel").  For these reasons, the plaintiffs have not established to the court's satisfaction that the defendants are vicariously liable for the alleged assault.

### b.  Wrongful Death

The plaintiffs also contend that the defendants are liable under the Israeli wrongful death statute because the death of Yael Botvin was caused by a tortious assault for which the defendants are responsible.  *See* Pls.' Mot. at 13.  The plaintiffs claim that because Yael Botvin would have been entitled to recover for her injuries had she not died, her dependents are entitled to compensation under the CWO.  *Id.*

Article 78 of the CWO establishes a right of recovery for heirs similar to the American tort of wrongful death.  *See* Pls.' Expert Aff. ¶ 24(b).  The article provides that

> [w]here the death of any person is caused by any civil wrong and such person would, if death had not ensued, have been entitled at the time of his death under the provisions of this Ordinance to compensation in respect of bodily injury caused to him by such civil wrong, the spouse, parent and child of such deceased person will be entitled to compensation from the person responsible for such civil wrong.

CWO (New Version), 5728-1968, 2 LSI 5, §78 (1972) (Isr.).

The provision makes clear that wrongful death liability attaches only when the offender is responsible for an underlying "civil wrong."  *See id.*  Thus, to establish the defendants' liability for wrongful death, the plaintiffs would have to establish that the defendants are responsible for the civil wrong that resulted in Yael Botvin's death – namely, the assault perpetrated by

members of Hamas.  *See id.*  The court has, however, already ruled that the plaintiffs have failed

to establish that the defendants are vicariously liable for that assault under Israeli law.  *See supra*

Part III.B.3.a.  Accordingly, the plaintiffs have failed to establish their right to relief for wrongful

death under Israeli law.

### c.  Direct and Indirect Mental Injury Claims

The plaintiffs also contend that they are entitled to damages for "mental injury," a tort

similar to intentional infliction of emotional distress.[14]  *See* Pls.' Mot. at 17.  The plaintiffs allege

that the victim suffered direct mental injury, compensable under Israeli law, based on the

substantial harm inflicted by the physical attack.  *See* Pls.' Mot. at 17; Pls.' Expert Aff. ¶ 19.

The plaintiffs also argue that the victim's mother and two sister suffered derivative mental

injury, based on their close relationship to the victim, the trauma associated with learning of the

injurious event and the severity of their loss.  *See* Pls.' Expert Aff. ¶¶ 21-23.

Mental injury, unlike the previous causes of action, is judicially defined.  *See id.* ¶ 17.

The Supreme Court of Israel has held that to recover for mental injury, the mental injury must be

the result of tortious conduct.  *See* CA 444/87 *Munhar Alsouche v. Dehan*, ¶ 20 [1990] (Isr.)

(limiting liability for mental injuries to those injuries that were a reasonably foreseeable result of

tortious conduct); Pls.' Expert Aff. ¶ 16 (noting that recovery for emotional distress requires

tortious conduct, whether intentional or negligent).  Both direct and indirect victims of the

"tortfeasor's wrongdoing" can recover from the tortfeasor for harms sustained.  Pls.' Expert Aff.

¶ 18.

The plaintiffs allege that the assault perpetrated by Hamas constitutes the prerequisite

tortious conduct necessary to give rise to a mental injury claim.  *See id.* ¶ 20; Pls.' Mot. at 17-20.

---

[14]     Unlike intentional infliction of emotional distress, the tort of mental injury allows victims to
recover even if the injury was caused by a negligent act.  *See* Pls.' Expert Aff. ¶ 16.

Again, however, the plaintiffs have failed to establish that the defendants can be held vicariously liable for the assault under Article 25.  *See supra* Part III.B.3.a.  In the absence of evidence sufficiently demonstrating the defendants' vicarious liability under Israeli law for the assault perpetrated by Hamas, the court declines to hold the defendants liable for the mental injuries of the victim and the remaining plaintiffs.

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion to amend or alter an interlocutory order, and denies without prejudice the plaintiffs' motion for declaratory judgment. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 25th day of March, 2011.

RICARDO M. URBINA
United States District Judge