**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ESTATE OF YAEL BOTVIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 05-cv-220 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.  INTRODUCTION

This matter is before the Court on plaintiffs' fifth motion for default judgment.  Pls.'

Mot., Sept. 15, 2011, ECF No. 30.[1]  Plaintiffs have brought suit against the Islamic Republic of

Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), the Iranian

Revolutionary Guard ("IRG"), Ayatollah Syyid Ali Hosseini Khamenei, Ali Akbar Hashemi-

Rafsanjani, Ali Fallahian-Khuzenstani, Hamas, and John Does 1–99 under the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*.  Through this action, plaintiffs seek to hold

defendants responsible for a 1997 terrorist attack perpetrated by Hamas operatives in Jerusalem,

Israel.  Today, this Court determines that plaintiffs have presented satisfactory evidence that the

---

[1] While plaintiffs captioned the motion as their "Second Supplemental Motion for Entry of Default Judgment and Memorandum in Support Thereof," a review of pages 2–3 of Judge Urbina's Memorandum Opinion of March 25, 2011, shows four previous times that this Court considered motions for default judgment.  *See* Mem. Order (Sept. 24, 2007); Mem. Order (Mar. 27, 2009); Mem. Op. (Feb. 16, 2010); Mem. Op. (Mar. 25, 2011).

remaining defendants—Iran, MOIS, and IRG—should be held liable under Israeli law for the 1997 bombing.[2]

## II.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' claims arise from a terrorist bombing that was committed at an Israeli pedestrian mall.[3]  Compl. ¶ 18.  On the afternoon of September 4, 1997, three suicide bombers entered the crowded Ben Yehuda Street pedestrian mall in downtown Jerusalem and detonated bombs packed with nails, screws, pieces of glass, and chemical poisons.  *Id; Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 261 (D.D.C. 2003).  The explosion wounded nearly two hundred people, killing five.  Compl. ¶ 19.  Tragically, fourteen-year-old Yael Botvin, the daughter of plaintiff Julie Goldberg-Botvin and the sister of plaintiffs Tamar and Michal Botvin, was among those killed.  Mem. Order, Sept. 24, 2007, at 1.  The attack was committed by members of the terrorist organization Hamas—which afterward claimed responsibility for the bombing.  *Campuzano*, 281 F. Supp. 2d at 262.

Plaintiffs filed their first motion for default judgment in October 2006.  Pls.' Mot., Oct. 15, 2006, ECF No. 14.  In their motion, plaintiffs requested that this Court take judicial notice of the findings of fact and conclusions of law in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003), a case arising out of the same September 4, 1997 suicide bombing.  Pls.' Mot., *supra*, at ¶¶ 8–10.  This Court granted plaintiffs' request to take judicial notice, but declined to enter a default judgment as the plaintiffs had failed to establish a legal basis for

---

[2] Defendants Ayatollah Syyid Ali Hosseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzenstani, Hamas, and John Does 1–99 were previously dismissed for plaintiffs' failure to prosecute in this Court's Memorandum Order of March 27, 2009, at 1 n.1.

[3] More detailed summaries of the relevant facts and procedural history may be found in prior decisions of this Court. *See* Mem. Op. (Feb 16, 2010) at 2–3; Mem. Order (Mar. 24, 2009) at 1–2; Mem. Order (Sept. 24, 2007) at 1–2.

default judgment.  *Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 102–103 (D.D.C. 2007) (Urbina, J.) ("*Botvin I*").

Plaintiffs filed their second motion for default judgment in March 2008.  Pls.' Mot. for Entry of Final J., Mar. 21, 2008, ECF No. 17.  This Court denied plaintiffs' second motion on similar insufficient evidence grounds.  *Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 24–25 (D.D.C. 2009) (Urbina, J.) ("*Botvin II*").  At the same time, this Court also denied plaintiffs' request to proceed under the newly enacted FSIA state sponsored terrorism exception codified at 28 U.S.C. § 1605A.  *Id.* at 25–26.[4]

Plaintiffs filed their third motion for default judgment in May 2009.  Supplemental Mot. for Default J., May 28, 2009, ECF No. 22.  In response, this Court concluded that plaintiffs had established this Court's subject matter jurisdiction over the dispute and personal jurisdiction over the defendants pursuant to the FSIA.  *Botvin v. Islamic Republic of Iran*, 684 F. Supp. 2d 34, 37–39 (D.D.C. 2010) (Urbina, J.) ("*Botvin III*").  This Court also applied District of Columbia choice of law rules and determined that plaintiffs' substantive claims were governed by Israeli law.  *Id.* at 39–42.  Because plaintiffs had addressed California law and had not established defendants' liability under Israeli law, this Court denied plaintiffs' motion without prejudice.  *Id.* at 41–42.

Plaintiffs filed their fourth motion for default judgment in July 2010.  Supplemental Mot. for Default J., July 9, 2010, ECF No. 26.  Plaintiffs concurrently asked the Court to reconsider its decision that Israeli law applied to the dispute.  *Id.*  In response, this Court denied reconsideration of its choice of law ruling and yet again ruled that the plaintiffs had not presented

---

[4] Plaintiffs filed a related case asserting a cause of action under 28 U.S.C. § 1605A on March 24, 2008.  *See* Compl., *Botvin v. Islamic Republic of Iran*, Civil Case No. 08-cv-503, ECF No. 1 (D.D.C. Mar. 24, 2008).  In the Complaint, plaintiffs note that they "have brought this action to protect their rights to proceed under the cause of action created by 28 U.S.C. § 1605A(c)." *Id.* at 5 n.1.  Inexplicably, plaintiffs failed to respond to an order to show cause in their 2008 case and it was dismissed for failure to prosecute.  Order, Apr. 23, 2010, ECF No. 3.

the Court with satisfactory evidence of defendants' liability under Israeli law.  *Botvin v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 223–232 (D.D.C. 2011) (Urbina, J.) ("*Botvin IV*").

Today, this Court reviews plaintiffs' fifth motion for default judgment and determines that plaintiffs have presented satisfactory evidence to establish defendants' liability under Israeli law.  This Court also determines that the Estate of Yael Botvin is entitled to compensatory damages under Israeli law; however, there is insufficient evidence that Yael's family members are entitled to compensatory damages under Israeli law.

## III.   FINDINGS OF FACT

Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court.  28 U.S.C. § 1608(e); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6 (D.D.C. 2011).  Courts are therefore bound by a duty to scrutinize the plaintiffs' allegations, and courts may not simply accept a complaint's unsupported allegations as true.  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).        FSIA courts may rely upon traditional forms of evidence—testimony and documentation—and plaintiffs may also submit evidence in the form of affidavits.  *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (citing *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 82 (D.D.C. 2006)).  Additionally, a FSIA court may "'take judicial notice of related proceedings and records in cases before the same court.'" *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d, 52, 59 (D.D.C. 2010) (quoting *Brewer v. Islamic Republic of Iran,* 664 F. Supp.2d 43, 50–51 (D.D.C. 2009)).  Here, plaintiffs rely on judicial notice, documentary, and affidavit evidence in support of their motion for default judgment.

### A.   Judicial Notice of Prior Related Cases

Under the Federal Rules of Evidence, courts are permitted to take judicial notice of facts "not subject to reasonable dispute" where those facts are either "generally known within the territorial jurisdiction" or are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This rule permits courts to take judicial notice of court records in related proceedings. 29 Am. Jur. 2d *Evidence* § 151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that the principle permitting courts to take judicial notice of current proceedings "is equally applicable to matters of record in the proceedings in other cases in the same court"). Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings. *See, e.g.*, *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010); *Valore*, 700 F. Supp. 2d at 59–60; *Brewer*, 664 F. Supp. 2d at 50–51 (D.D.C. 2009).

A difficult issue arises concerning judicial notice of related proceedings with regard to courts' prior factual findings. While such findings in a prior proceeding are "capable of accurate and ready determination" from judicial records, Fed. R. Evid. 201(b), it cannot be said that these same findings are "not subject to reasonable dispute." *Id.* Specifically, such findings represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events. As such, they constitute hearsay, and thus are considered inadmissible. *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 110 (D.D.C. 2007) (citing *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994)).

This Court grappled with these difficulties in *Rimkus*, where— "mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key

facts in related cases arising out of the same terrorist attack," 750 F. Supp. 2d at 163 (citing

*Brewer*, 664 F. Supp. 2d at 54)—it determined that the proper approach is one "that permits

courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . .

without necessitating the formality of having that evidence reproduced." *Id.* (citing *Murphy*, 740

F. Supp. 2d at 58). Thus, based on judicial notice of the evidence presented in the earlier cases—

here, *Campuzano*—courts may reach their own independent findings of fact.

### B.      Relevant Findings of Fact

This action arises out of a triple-suicide bombing at an Israeli pedestrian mall on

September 4, 1997. In support of their claims, plaintiffs ask this Court to take judicial notice of

its previous findings in the *Campuzano* case, during which the Court, the Honorable Ricardo

Urbina presiding, held a four-day evidentiary hearing. 281 F. Supp. 2d at 261. Bearing in mind

the parameters for judicial notice in FSIA actions set forth above, the Court takes judicial notice

of the evidence presented in *Campuzano* and renders the following findings of fact:

*Defendants*

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism

pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j),

continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47. Defendant MOIS is the

secret police and intelligence organization of Iran. In *Valore*, this Court characterized MOIS as a

"division of the state of Iran" that "acted as a conduit for the Islamic Republic of Iran's provision

of funds to Hezbollah." 700 F. Supp. 2d at 53, 65; *see also Campuzano*, 281 F. Supp. 2d at 262.

Defendant IRG is the military wing of MOIS. *Campuzano*, 281 F. Supp. 2d at 262.

*Defendants' Involvement in the September 4, 1997 Bombing*

Dr. Rueven Paz, former head of the Israeli General Security Service's Department of Research and a qualified expert in Palestinian Islamic terrorism organizations, testified during the *Campuzano* trial.  Trial Tr. Day 1, 25–59.  Dr. Paz testified that the bombing was planned by a six-person Hamas[5] cell organized by Mahmoud Abu Hanoud—a senior commander in Hamas' military wing.  *Id.* at 30:10–18.  Abu Hanoud received the orders to conduct this attack from Hamas' headquarters in Amman, Jordan.  *Id.* at 31:3–11; 32:3.  Abu Hanoud received most of his explosives and military training in an Iranian-sponsored terrorist training camp.  *Id.* at 51:7–13.

Dr. Paz testified that Iran was "encouraging and pushing" Hamas' leaders to carry out suicide bombings as a policy, and that policy "was approved by the highest authorities in Iran." *Id.* at 34:2–8.  Iran's relationship with Hamas began in the early 1990's.  *Id.* at 31:17–25.  In 1994, Iran received "the first delegation of Hamas members who were trained directly by the Iranians on Iranian soil."  *Id.* at 32: 8–10.  As the Iran-Hamas relationship matured, "[t]he involvement of Iran became stronger and stronger with Hamas and especially with these terrorist activities, and it was actually coordinated mainly between Jordan or between Hamas officers in Jordan and Tehran since most of it involved [] military issues."  *Id.* at 32: 10–14.  Three Iranian offices were in almost daily contact with Hamas: MOIS, IRG, and the Iranian Ministry of Foreign Affairs.  *Id.* at 33:13–19.

Abu Hanoud personally directed the scouting, planning, disguising, safe housing, traveling, and purchasing involved in this "sophisticated" attack.  *Id.* at 42:21–43:4.  Dr. Paz testified that "[w]ithout Iran, Abu Hanoud would never have known how to build this type of bomb and conduct this type of operation."  *Id.* at 59:1–4.  Prior to the attack, Abu Hanoud assigned a Hamas member named Al Zaban—who disguised himself as a surveyor—to scout

---

[5] Hamas is an Islamic militant terrorist organization.  *Campuzano*, 281 F. Supp. 2d at 262.

areas of Jerusalem to find "the most crowded, the most effective places for . . . an attack." *Id.* at 35:11–23. Al Zaban settled on the pedestrian mall because of its crowds of people and its proximity to government buildings. *Id.* at 28:6–11. Two days before the bombing, the three suicide bombers cut their fingertips to prevent identification of their bodies. *Id.* at 36:4–22.

On the afternoon of September 4, 1997, "three Hamas suicide bombers with cases of powerful explosive bombs arrived at the crowded Ben Yehuda Street pedestrian mall in downtown Jerusalem." *Campuzano*, 281 F. Supp. 2d at 262 (citing Trial Ex. 28 at 1). These bombs contained "nails, screws, pieces of glass, and chemical poisons to cause maximum pain, suffering, and death." *Id.* The bombs were intended to be detonated in intervals designed to inflict maximum causalities on both civilians and responding rescue workers. Trial Tr. Day 1, at 37:11–19. The explosion wounded nearly 200 civilians and killed five, including fourteen-year-old Yael Botvin, the daughter of plaintiff Julie Goldberg-Botvin and sister of plaintiffs Tamar and Michal Botvin. *Id.* at 39:12–16. Hamas publically claimed responsibility for the bombing. Trial Tr. Day 1, at 9:11–17; 27–29; 53:22–23; Exs. 3 §§ 69–83, 3 § 22, 7 § 26.

*Iranian Support for Terrorism Generally*

Iran provided financial, technical and other material support to Hamas and other terrorist groups, including Hizbollah and the Palestinian Islamic Jihad, at the time of this bombing. In the *Campuzano* case expert Dr. Bruce Teffit, a twenty-year CIA veteran and founding member of the CIA's counter-terrorism center, testified regarding the massive support Iran provides terrorist organizations. Trial Tr. Day 1, at 4:7–25:1 Dr. Teffit estimated that in the early-to-mid 1990's, Iran provided around $30,000,000 a year to Hamas. *Id.* at 17:20–23. Dr. Patrick Clawson, another expert on Iranian support for terrorism, testified that Iran annually provided Hamas between $25,000,000–$50,000,000 of material and cash support in the 1990s. *Id.* at 77:16–23.

Most of this funding and support passed to Hamas via defendants MOIS and its military wing the IRG. *Id.* at 78:3–13. Overall, MOIS spends between $50,000,000 and $100,000,000 a year supporting terrorist activities. *Id.* at 113, Ex. 61; *Campuzano*, 281 F. Supp. 2d at 262 ¶ 10.

*Plaintiffs*

*Estate of Yael Botvin*

Yael Botvin, a fourteen-year-old ninth grader, was on her way home from the Emunah School for the Arts in Jerusalem, Israel, when she was killed by the September 4, 1997 suicide bombing. Dep. of Jule Goldberg-Botvin, at 38:21–41:13, ECF No. 17-1 to 17-2. Yael had stopped by the mall to buy school supplies when the bombing occurred. *Id.* at 44:21–22; 45:20–25. Experts opined that Yael survived approximately four hours after the bombing, and died due to burns, puncture wounds, and other unspecified internal injuries caused by the explosion. Expert Opinions, Pls.' Exs. 13–14, ECF No. 22-4. She was an American citizen at the time of her death. Birth Certificate, Pls.' Ex. 2, ECF No. 22-1. Her estate is properly represented in this action by its administrator, Russell Ellis. *See* Short Certificate, Non-Domiciliary Letters of Administration, Commonwealth of Pennsylvania, County of Montgomery, May 25, 2004, ECF No. 18-1, at 2–3.

*Julie Goldberg-Botvin*

Julie Goldberg-Botvin, Yael's mother, spent "about two hours" not knowing whether Yael was safe or whether Yael had been injured by the bombing. Dep. of Jule Goldberg-Botvin, at 43:23–44:5, ECF No. 17-2. She stated that "[i]t was horrible, but we didn't know what to do with ourselves so we just stayed there." *Id.* at 44:7–8. Julie and Russell were then driven by friends to Bikur Cholim hospital where they were shown a picture of Yael's face and asked to identify her. *Id.* at 48:2–6. The first week "was very difficult because we have people coming to

the house from the early morning until night." *Id.* at 51:17–52:3.  Life without Yael was "very

quiet. . . we still miss her." *Id.* at 57:10–14.  Poignantly, Julie reflected that "[w]e might look

okay on the outside, but on the inside we are not okay, even ten years later.  For me it's terrible

to see Yael's friends who are now 24, 25 years old, and married and some of them have babies.

It is very difficult." *Id.* at 60:14–17.  Julie was a citizen of the United States at the time of Yael's

death and remains so today.  Passport of Julie Goldberg-Botvin, Pls.' Ex. 5, ECF No. 22-1.

### *Tamar Miriam Dagan (Botvin)*

Tamar Botvin[6] submitted an affidavit.  *See* Aff. of Tamar Botvin Dagan, Ex. J, ECF No.

18-2.  Tamar, an American citizen at the time of the bombing and today, was Yael's older sister.

Passport of Tamar Miriam Dagan, Pls.' Ex. 5, ECF No. 22-1.  She was fifteen at the time of

Yael's death.  *Id.*  Since Yael's death, Tamar has "found it very difficult to discuss the emotional

impact . . . and the best way for [her] to express [her] feelings is in writing." *Id.* at 2.  On the day

of the bombing, Tamar was returning from a school trip when a teacher told her news Tamar

described as the "worst of my life." *Id.* at 3.  Her sister's death came "less than four years after

[their] father died of coronary artery disease." *Id.*  Tamar stated that "[w]e were just beginning

to feel like we were coming to terms with the sudden loss of a parent when our family was torn

apart again." *Id.*

### *Michal Leah Botvin*

Michal Botvin, Yael's younger sister, was an American citizen at the time of the bombing

and remains so today.  Dep. of Michal Leah Botvin, Ex. K, ECF No. 18-2, at 4; Passport of

Michal Leah Botvin, Pls.' Ex. 5, ECF No. 22-1.  She was in seventh grade on September 4, 1997

and was eleven-years old.  Michal Dep., at 13:8–9.  When the bombing occurred, Michal was

---

[6] On September 2, 2004, Tamar married and changed her name to Tamar Botvin Dagan.  Aff. of Tamar Botvin
Dagan ¶ 5, ECF No. 22-1.

home with her mother Julie; she later went with Julie to the hospital where she learned of Yael's death. *Id.* at 9:21–10:15.   Michael felt that "it was very hard for my mother and me and Tamar to deal with Yael's death, especially because my father died a few years before. . . it is still hard . . . to continue living with the loss of Yael." *Id.* at 20: 18–25.   Even after ten years had passed, Michal explained that "it is hard to live knowing that Yael is not with us, and that she could have been with us." *Id.* at 16:18–21.

## IV.   CONCLUSIONS OF LAW

### A.   Jurisdiction

Subject to certain enumerated exceptions—including the state-sponsored terrorism exception—the FSIA simultaneously provides immunity to foreign states from suit and denies all U.S. federal and state courts jurisdiction over such actions.   28 U.S.C. § 1604.   Under certain conditions, however, courts obtain original jurisdiction over suits against foreign states, and those states' general immunities are waived by operation of statute.   *See* 28 U.S.C. § 1330.   This Court has previously ruled that it has both subject matter jurisdiction over plaintiffs' claims and personal jurisdiction over defendants.   *Botvin III*, 684 F. Supp. 2d at 37–39.   This Court will not rehash its detailed analysis of these issues from its previous decision.

### B.   Liability under Israeli Law

FSIA § 1605(a)(7) is only jurisdictional and contains no substantive cause of action.   *See In Re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 54–55 (D.D.C. 2009) (*citing Cicippio-Puelo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004)).[7]   As a result,

---

[7] The so-called "Flatow Amendment," codified at 28 U.S.C. § 1605 note, "provides a private right of action only against individual officials, employees, and agents of a foreign state, but not against the foreign state itself." *Cicippio-Puleo*, 353 F.3d at 1034.   These "officials, employees and agents" may only be sued in their "individual" capacity. *Id.*   Here, the only remaining defendants are Iran, MOIS, and IRG—none of which qualify under the Flatow Amendment as an official, employee or agent, and none of which are sued in an individual capacity.   While *Cicippio-Puleo* was statutorily superseded by the passage of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3 § 1083 ("NDAA"), this case was filed prior to the 2008 NDAA under §

Plaintiffs must find a cause of action based on some other source of law. *Id.* This Court's previous *Botvin III* and *Botvin IV* opinions held that Israeli law applies to this case. Therefore, the Court will first determine the proper cause of action to apply under Israeli law and then apply the facts of this case to that standard.

### 1.  Legal Standard for Applying Foreign Law

Federal Rule of Civil Procedure 44.1 provides that when determining the law of a foreign jurisdiction a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Most often, foreign law is established through "written or oral expert testimony accompanied by extracts from foreign legal material." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984). Such expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case. *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 182 (D.D.C. 2006). The court, however, need not uncritically accept such expert testimony and may "engage in its own research . . . [or] reexamine and amplify material that has been presented by counsel in partisan fashion." Fed. R. Civ. P. 44.1 (advisory committee's note).

### 2.  Defendants are Liable for Negligence as an Aider and Abettor under Israeli Law

Plaintiffs move for a judgment that defendants are liable under Israeli law for aiding and abetting Hamas' negligence and breach of its statutory duty. *See* Pls.' Mot., at 6–16. Relevant here is Israel's Civil Wrongs Ordinance ("CWO"), which establishes general rules concerning

---

1605(a)(7) and thus *Cicippio-Puleo*'s interpretations of § 1605(a)(7) and the Flatow Amendment still controls. *Cf. Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 20008), *rev'd on other grounds sub nom. Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009) (observing that although Congress repealed § 1605(a)(7), courts "retain jurisdiction pursuant to § 1605(a)(7) over cases that were pending under that section when the Congress [repealed it]").

tort liability, defenses, and remedies.  *See* University of Haifa Faculty of Law, The Law of Israel: General Surveys 279 (Itzak Zamir & Sylviane Colombo eds., 1995); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 80 (D.D.C. 2010) (citing Israel Galid, *Liability for Damage Caused by Others Under Israeli Law*, *in* Unification of Tort Law: Liability for Damage Caused by Others 139, 142–43 (J. Spier ed., 2003)).  Because the Court finds that defendants aided and abetted Hamas' negligence, it need not reach the question of whether defendants may be liable under a breach of a statutory duty theory. [8]

### a.    Hamas Is Liable for the Attack

The plaintiffs first argue that Hamas is liable for the tort of negligence under Israeli law. *See* Pls.' Mot., at 6–9.  Under Israeli law, negligence consists of four elements: (1) a duty of care; (2) breach; (3) proximate cause (sometimes divided to cause-in-fact and legal causation); and (4) damages.  *See, e.g.*, CA 243/83 *City of Jerusalem v. Gordon*, P.D. 39(1) 113, 128 (1985) (analyzing the four elements of negligence).

The Court has little difficulty concluding that Hamas's acts amount to negligence under Israeli law.  First, Israeli law recognizes that a duty of care exists not to harm others.  Pls.' Mot., Ex. 1 ("Schnoor Aff.") ¶ 20 (citing *City of Jerusalem*, P.D. 39(1) at 131-32).  Second, Hamas breached that duty by detonating a suicide bomb in a crowded public area.  *Id.* (citing CA 796.80 *Ohana v. Abraham*, P.D. 37(4) 337 (1983) (concluding that intentional killings breached the duty of care)).  Third, the Court concludes that the plaintiffs' injuries were proximately caused by Hamas's acts.  Israeli law sets forth three different tests for determining legal causation: proximity, zone of risk and common sense.  *Id.* ¶ 24.  Each test ultimately revolves around the

---

[8]It appears plaintiffs have abandoned any argument that defendants may be held liable under the Israeli tort of "mental injury."  Plaintiffs raised this theory of liability in their fourth motion for default judgment, Supplemental Mot. for Default J., July 9, 2010, ECF No. 26, at 17–20.  Last year, this Court held that at least one element of the mental injury tort had not yet been satisfied.  *Botvin IV*, 772 F. Supp. 2d at 231–32.  Plaintiffs have failed to move for judgment under this tort—or any other intentional tort theory—in their current motion.

reasonable foreseeability of the act's consequences. *Id.*; *see also Wultz*, 755 F. Supp. 2d at 80. Here, a reasonable person could foresee that detonating an explosive device in a crowded area would cause grave harm to those individuals in the vicinity of the attack. Fourth and finally, Hamas damaged the plaintiffs by causing Yael Botvin's death. *See* CWO (New Version), 5728– 1968, 2 LSI 5, § 2 (1972) (Isr.) (defining damage as "*loss of life*, or loss of, or detriment to, any property, comfort, bodily welfare, reputation or other similar loss or detriment") (emphasis added). Accordingly, the Court concludes that Hamas is liable for negligence under the CWO.

### b. Iran is Liable as an Aider and Abettor of Hamas' Negligence

Plaintiffs argue that defendants are liable under Israeli law for aiding and abetting Hamas' negligence. Pls.' Mot., at 17. Israeli law imposes liability on actors who aid and abet another's tortious actions. Shnoor Aff. ¶ 38. More specifically, Article 12 of the CWO provides that "any person who joins or aids in, authorizes, counsels, commands, procures, or ratifies any act done or to be done, . . . or any omission made or to be made, . . . by any other person shall be liable for such act or omission." CWO (New Version), 5728–1968, 2 LSI 5, § 12 (1972) (Isr.). *Accord Wultz*, 755 F. Supp. 2d at 80 (quoting CA 6871/99 *Rinato v. Rom*, 56(4) PD 72, 81-82 (2002)); *see also* Pls.' Mot., at 17; Shnoor Aff. ¶ 38 ("[I]n order for a person to be liable . . . a person should either aid the principal actor in performing a civil wrong . . . or encourage him to perform it, foreseeing that the principal actor is about to commit the wrong."). A plaintiff may establish aiding and abetting liability by showing that the defendant was aware of the other's violent intentions and that they nonetheless provided support in spite of them. *Wultz*, 755 F. Supp. 2d at 80 (citing Galid, *Multiple Tortfeasors Under Israeli Law*, *supra*, at 106–107).

This Court has previously taken judicial notice of the factual conclusions set forth in *Campuzano*, which found, *inter alia*, that:

(1) Hamas has a close relationship with Iran;

(2) Iran provides ongoing terrorist training and economic assistance to Hamas;

(3) Iran funnels much of its support to Hamas through MOIS (an Iranian ministry);

(4) IRG is the military wing of MOIS.  Under the direction of MOIS, IRG provides professional military and terrorist training to Hamas operatives responsible for executing terrorist acts throughout the Middle East;

(5) Iranian governmental support for terrorism is an official state policy and the approval of high-ranking Iranian officials was necessary for Iran and MOIS to support Hamas with training and economic assistance; and

(6) The bombing would not have occurred without Iranian sponsorship.

281 F. Supp. 2d at 262 (D.D.C. 2003) (citations and quotations omitted).   Additionally, this Court has concluded that defendants provided Hamas with crucial funding, support and training necessary to allow Hamas to conduct terrorist attacks, including the one at issue here.  *See* Part III.B.; *see also Botvin IV*, 772 F. Supp. 2d at 230 (citing *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 261–62 (D.D.C. 2003)).

The facts in the record therefore conclusively show that defendants Iran, MOIS, and IRG aided and counseled Hamas in conducting terrorist attacks in general, and the attack that killed Yael Botvin specifically.  It is also clear from these facts that Iran could reasonably foresee the consequences of Hamas's violent intentions—Hamas is, after all, an internationally recognized terrorist organization.  *See Wultz*, 755 F. Supp. 2d at 80.  The Court therefore concludes that these acts are sufficient to establish Iran, MOIS, and IRG's liability for aiding or abetting Hamas's tortious acts under Article 12 of the CWO.[9]

---

[9] Because this Court finds that Article 12 of the CWO provides a basis of liability for defendant, it declines to reach the issue of whether they might also be liable on alternate theories of liability.  *See Belkin v. Islamic Republic of*

## V.        DAMAGES

Plaintiffs request an award of damages consistent with the award in *Campuzano* and in the highest possible amount allowable under Israeli law.  *See* Pls.' Mot., at 18–20.  To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner."  *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009) (citing *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (citations omitted)).  Plaintiffs must therefore prove a reasonably certain estimate of future damages by a preponderance of the evidence.  *Id.*  In this instance, Israeli law controls the disposition of this action, *see Botvin IV*, 772 F. Supp. 2d at 226, and this Court must account for the extent to which Israeli law would restrict or enhance available damages under the FSIA.  *See, e.g.*, *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 24 (D.D.C. 2011) (applying French law to FSIA damages award).

### A.        Economic Damages (Wrongful Death)

Count I of the Complaint requests damages for Yael Botvin's wrongful death.  Compl. ¶¶ 31–36.  Article 78 of Israel's CWO provides:

> Where the death of any person is caused by any civil wrong and such person would, if death had not ensued, have been entitled to at the time of his death under the provisions of this Ordinance to compensation in respect of bodily injury caused to him by such civil wrong, the spouse, parent and child of such deceased person will be entitled to compensation from the person responsible for such civil wrong.

Gabbay & Deborin Aff. ¶ 30, Ex. 2, ECF No. 30-1 (citing Civil Wrongs Ordinance (New Version) § 78, 5728-1968, 2 LSI (New Version) 5 (1972) *as amended* (Isr.)).  This is "similar to a wrongful death action in the United States."  *Id.* at ¶ 24(b).  Under the law of Israel, "[t]he

---

*Iran*, 667 F. Supp. 2d 8, 21 (D.D.C. 2009) (holding that civil conspiracy provided a basis of liability for defendants Iran and MOIS and declining to reach the issue of whether they might also be liable on other theories of liability); *see also Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (same).

tortfeasor must compensate the [dependents] of the deceased for the loss of the economic support to which they had an expectation, had the deceased remained alive." *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 161–62 (D.D.C. 2009) (citations omitted).  A defendant may also be liable for the loss of the decedent's future earnings, which measures the loss of earnings that the deceased would have otherwise earned in the future.  *See Wachsman*, 603 F. Supp. 2d at 161-62; *see also* Gabbay and Deborin Aff. ¶ 39.  Typically, courts assess these damages by utilizing reports from expert testimony regarding the decedent's earnings and potential earning power.  Gabbay and Deborin Aff. ¶ 39; s*ee Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 20 (D.D.C. 2007); *Blais*, 459 F. Supp. 2d at 51.

Here, plaintiffs have appropriately provided the court with an expert report.  S*ee* Assessment of Economic Loss in the Matter of *Ellis v. Islamic Republic of Iran*, Ex. 3, ECF No. 30-1 ("Expert Economic Loss Report").  Plaintiffs' report was submitted by the Center for Forensic Economic Studies ("CFES").  *See* Expert Economic Loss Report at 1.  In determining the appropriate economic damages, CFES assumed that the decedent Yael Botvin would achieve an average life expectancy, attain either a bachelor's degree and/or a post-graduate degree, and it accordingly accounted for the expenses that would have been incurred by the decedent if she had remained alive.  *Id.* at 3.  Accordingly, CFES estimated that the total economic loss to the plaintiffs ranges from $1,053,145, assuming a bachelor's degree, to $1,704,457, assuming a post-graduate degree.  *Id.*

An award of $1,704,457 is well within the range of damage awards that are routinely granted in similar cases.  *Cf. Wachsman*, 603 F. Supp. 2d at 162 (awarding $3,040,289 in economic damages based on lost income); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) (awarding $3,731,839 for economic loss), *aff'd*, 718 F. Supp. 2d 25

(D.D.C. 2010); *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 130 (D.D.C. 2007)

(awarding $404,548 for economic loss); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.

Supp. 2d 229, 273 (D.D.C. 2006) (awarding $1,598,688 for economic losses).   Additionally,

prior to her death Yael had been accepted to a prestigious school and had above average grades.

Dep. of Julie Goldberg-Botvin 33:15–23; 37:2–5; Ex. 12.   Furthermore, the heinous nature of the

terrorist attack that took place necessitates a damage award in the upper range of economic

losses to appropriately compensate the plaintiffs for the damages incurred.   Accordingly, the

Court awards plaintiff the Estate of Yael Botvin a total of $1,704,457 in compensatory economic

damages

### B.       Pain and Suffering (Survival Action)

Count II of the Complaint requests damages for Yael Botvin's pain and suffering through

a survival action.   Compl. ¶¶ 37–39.   A survival action "is based upon the notion that when a

victim who suffered a civil wrong dies, her rights against the liable tortfeasor are transmitted to

her heirs."   Gabbay and Deborin Aff. ¶ 24(a).   Article 19 of the CWO provide that "[o]n the

death of any person, all causes of action in respect of any civil wrong subsisting against or vested

in him shall survive against or, as the case may be, for the benefit of, his estate."   *Id.* (quoting

Civil Wrongs Ordinance (New Version) § 19, 5728-1968, 2 LSI (New Version) 5 (1972) as

amended (Isr.)).   Included in the damages available under an Israeli law survival action are "past

non-pecuniary damages like pain and suffering and lost life expectancy."   Gabbay and Deborin

Aff. ¶ 25.

In this case, the expert testimony establishes that Yael Botvin survived for approximately

four hours after the explosion.   Expert Opinions, Pls.' Exs. 14, ECF No. 22-4.   However, nothing

in the expert affidavits on Israeli law establishes that Yael may be compensated irrespective of

whether she was conscious after the explosion.  *See* Gabbay and Deborn Aff. ¶¶ 25–29, 40.

Absent evidence to the contrary, the Court must assume that Israeli law only compensates for the

decedent's conscious pain and suffering in a survival action.  *Cf. Acosta v. Islamic Republic of*

*Iran*, 574 F. Supp. 2d 15, 27–28 (D.D.C. 2008) (citing reference omitted).  Unfortunately,

nothing in the expert testimony establishes that Yael was conscious of her injuries during this

four-hour period.  Moreover, plaintiffs have failed to cite any cases containing dollar figures

from which this Court could deduce the appropriate amount of a pain and suffering or a lost life

expectancy award under Israeli law.  Therefore, plaintiffs have failed to meet their burden to

prove by evidence satisfactory to the Court that they are entitled to compensation for Yael's

physical pain and suffering under Israeli law.

### C.      Solatium Damages

Count III and IV of the Complaint, respectively, contain claims for intentional infliction

of emotional distress and solatium.  Compl. ¶¶ 40–46.  "Solatium is defined as compensation for

hurt feelings or grief."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 n.4 (D.D.C.

2009) (citations omitted).  While stated as two separate counts, this Court has previously held

that "[i]n the context of FSIA cases" solatium is "indistinguishable" from an intentional

infliction of emotional distress claim.  *Id.*  Regardless of how the counts are viewed, plaintiffs'

motion for default judgment and the supporting affidavits are so inadequate in their discussion of

these Counts that this Court has no choice but to deny plaintiffs any recovery.

Plaintiffs' *fifth* motion for default judgment contains only three paragraphs of argument

in support of their emotional damages claims.  Pls.' Mot., Sept. 15, 2011, ECF No. 30, at 18–20.

Worse, just one paragraph—the third—discusses emotional damages.  *Id.* at 19–20.  The third

paragraph cites to one case, *Campuzano*, as precedent for awarding "family members . . .

compensatory damages for mental pain and anguish ranging from $2,500,000 to $6,000,000."
*Id.* at 19 (citing *Campuzano*, 281 F. Supp. 2d at 274–276).

It is true that the *Campuzano* plaintiffs who were not present at the suicide bombing—family members of direct attack victims—received solatium awards. *Campuzano*, 281 F. Supp. 2d at 276–77. However, *Campuzano* is distinguishable from this case because *Campuzano* was decided under United States law, not Israeli law. [10] Thus, the sole authority plaintiffs rely on is inapplicable law. This Court will not award millions of dollars in damages against a foreign sovereign on the basis of such inadequate legal authority.

Plaintiffs' expert affidavits cannot save their emotional damages claims either. These affidavits contain no guidance on the appropriate amount of solatium damages to award—if such damages are even available under Israeli law. A brief search of cases decided under Israeli law by other United States courts show why plaintiffs may desire to obfuscate this issue. It appears Israeli law lacks a legal mechanism by which plaintiffs could obtain compensation for their emotional or non-economic injuries:

> Under Israeli law emotional injury suffered as a result of the death of a loved one is generally not compensable unless it manifests as a psychiatric illness . . . . Furthermore, emotional harm is generally not compensable under Israeli law unless the plaintiff has established a reasonable causal proximity in both time and place, between the event and the emotional harm, and plaintiff either personally experiences the tragic event, or in an exceptional case, learns about the event in such circumstances that the emotional damage is 'expectable.'

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009) (internal citations omitted). Plaintiffs do not show any type of requisite psychiatric illness caused by the suicide bombing here.

---

[10] The Court therefore chooses not to adopt the framework set forth in *Heiser*, which applies United States law, in determining the appropriate measure of damages for family members of victims. *See generally Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25-26 (D.D.C. 2011); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269-70 (D.D.C. 2006).

Plaintiffs' deficient briefing on solatium damages might be forgiven if this Court had not previously instructed plaintiffs that "[t]he [C]ourt is not inclined to independently search through volumes of deposition transcripts to determine whether the plaintiffs have stated a claim." *Botvin II*, 604 F. Supp. 2d at 24 (citing *Potter v. District of Columbia*, 558 F. 3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) ("judges are not like pigs, hunting for truffles buried in briefs or the record") (quoting reference omitted)).  This Court is equally disinclined to conduct a detailed independent study of Israeli damages law where plaintiffs' counsel has not.  In light of the foregoing, the Court will DISMISS Counts III and IV.

## D.    Punitive Damages

Count V of the Complaint requests punitive damages.  Plaintiffs conceded in their fourth motion for default judgment that punitive damages are unavailable in this case under 28 U.S.C. § 1605(a)(7) by virtue of 28 U.S.C. § 1606.  *See* Pls.' Supp. Mot. for Default J., ECF No. 26, at 21 n.7; *see also Oveissi*, 768 F. Supp. 2d at 24 n.9 (citing *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198–200 (D.D.C. 2008)).  Plaintiffs also do not request punitive damages in their fifth motion for default judgment.  Therefore, the Court will DISMISS Count V.

## VI.    CONCLUSION

This Court has previously written at length about the "arbitrary and unfair" situation created by the 28 U.S.C. § 1605(a)(7) pass-through regime.  *In Re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. at 59–61 (describing how "hundreds of other equally deserving plaintiffs had their claims denied because they were domiciled in jurisdictions that did not afford them a substantive claim").  Today's decision is another sad example of the inconsistent results arising from this defunct regime: the family members of Yael Botvin receive no solatium compensation while family members of victims in the earlier *Campuzano* decision received

millions of dollars in solatium compensation.  *Campuzano*, 281 F. Supp. 2d at 276–277.

Thankfully, since the creation of the federal cause of action contained in 28 U.S.C. § 1605A,

these cases are becoming less common.  This Court hopes that the family members may take

some measure of solace in this Court's final judgment and in the $1.7 million in compensatory

damages awarded to the Estate of Yael Botvin.

A separate order and judgment consistent with this Memorandum Opinion shall issue this

date.

Signed by Royce C. Lamberth, Chief Judge, on July 3, 2012.